Jet Corporation v. Commissioner.
Jet Corp. v. Commissioner
Docket No. 27189.
United States Tax Court
1951 Tax Ct. Memo LEXIS 96; 10 T.C.M. (CCH) 951; T.C.M. (RIA) 51292; September 24, 1951
*96 Morton L. Deitch, Esq., and Bernard E. Brandes, Esq., for the petitioner. William E. Murray, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in the income tax of petitioner for the year 1944 in the amount of $5,040.07. The sole question involved is whether the petitioner is entitled to a bad debt deduction of $13,101.90, with respect to an alleged indebtedness between petitioner and an affiliated corporation, which is claimed to have become worthless in 1944. Findings of Fact Petitioner is a personal holding corporation organized under the laws of Delaware in 1927 with an authorized capital stock of 3,000 shares of a par value of $1,000 each 1,750 of which were issued to the incorporators for cash and other assets, as follows: Jacob Sperber and Tillie Sperber,
husband and wife
75%
Elliott Sperber and Charles Sperber,
two of their children
25% Subsequently, Jacob Sperber transferred by gift to his daughter, Estelle Sperber, 6 per cent of petitioner's outstanding stock. Petitioner filed its corporate income tax return and personal holding company tax return for 1944 with the *97 collector of internal revenue for the district of Delaware. Its business consists of investing its funds in stocks, bonds, mortgages and other securities, and its income is derived chiefly from dividends and interest. It is classified as a personal holding company and uses the accrual method of accounting. Its taxable year is the calendar year. On February 14, 1928, petitioner made a loan of $100,000 to United Stores Realty Corporation, a subsidiary of the United Cigar Stores Company of America, and received as collateral security therefor a mortgage bearing that date covering premises at 6001 Market Street, Philadelphia, Pennsylvania, and as further security a guarantee of the loan and interest due thereon, which guarantee was executed by United Cigar Stores Company of America. Either or both the borrower and its parent are sometimes referred to hereinafter as "United". Interest was paid to petitioner on the loan from 1928 until August 1932, in which year United Stores Realty Corporation and United Cigar Stores Company of America filed petitions in bankruptcy in the United States District Court for the Southern District of New York. Petitioner foreclosed the mortgage in March *98 1933. The foreclosure sale was held in April 1933. Petitioner made a nominal bid in the amount of $50 for the property and was the successful bidder. Petitioner filed a claim against both United Stores Realty Corporation and United Cigar Stores Company of America in the bankruptcy proceedings for $99,950. The property was located at the northwest corner of 60th and Market Streets, Philadelphia, Pennsylvania, with a frontage of 20 feet and a depth of 80 feet, and was improved by a three-story brick building approximately 20 feet by 70 feet with a one-story brick addition about 10 feet by 20 feet. On the first floor there was a corner store and four small stores on Sixtieth Street, and on the second floor two suites of offices. On the third floor there was an apartment which had not been occupied for many years. The corner store and two of the stores on Sixtieth Street were occupied as was the second floor. The building was heated by individual gas radiators. In November 1932, three appraisers, appointed by the United States District Court, estimated the value of the property to be $60,000. During the years 1933, 1934 and 1935, the property was assessed by the City of Philadelphia *99 for tax purposes at $81,000. On or about April 3, 1933, Manhattan Real Estate Holding Corporation, referred to sometimes hereinafter as "Manhattan", was organized under the laws of Pennsylvania. Ten shares of stock of this corporation were issued on April 6, 1933, for $500 to the following: Petitioner
7 shares
Jacob Sperber
1 share
Elliott Sperber
1 share
Leon E. Spurling
1 share In April 1936, petitioner transferred its seven shares to Elliott Sperber for $350, and Leon E. Spurling transferred his one share to Tillie Sperber. Manhattan was organized for the purpose of acquiring title to the Market Street property. Petitioner had been advised that it was unwise for it to take title to the property because this would subject its very substantial assets to the risks and liabilities of owning and operating real property, as well as to the incidence of Pennsylvania taxes and regulations. The minute book of petitioner recites that a special meeting of its board of directors was held at 3 P.M. on April 6, 1933, in New York City, at which it was resolved that it assign the bid on the Philadelphia property upon such terms as its president might deem proper. During *100 the same afternoon, at the office of the attorneys for petitioner in New York City, Jacob Sperber signed the following letter: "New York, April 6, 1933. "Manhattan Real Estate Holding Co., New York City. "Gentlemen: "Pursuant to resolution of our Board of Directors of this day, we hereby offer to sell to you our bid in the nominal sum of $50 made at foreclosure sale on April 3rd, 1933, to the Sheriff of Philadelphia County for the purchase at foreclosure of premises 6001 Market Street, Philadelphia, Pa. The price for which we will assign said bid to you is the sum of One Hundred Thousand Dollars ($100,000) to be paid by you by putting and keeping on your books a demand credit to our order in the sum of $100,000 bearing interest at 6% per annum. "It is further understood that we are the holders of bonds of the United Cigar Stores Company of America and United Stores Realty Corporation, each in the sum of $100,000, each of which said companies agreed to pay said sum secured by mortgage which we caused to be foreclosed on said premises. If at any time we receive any payment on account of either of said bonds, the net amount received will be credited by us against your said obligation *101 in the sum of $100,000 and interest. "Very truly yours, JET CORPORATION By (signed) Jacob Sperber, President." The minute book of Manhattan recites, among other things, that at the organization meeting of its board of directors, held in Philadelphia, Pennsylvania, at 5 P.M. on April 6, 1933, it was resolved to accept the offer contained in petitioner's letter, which is quoted above. The minutes of the April 6, 1933, meetings of petitioner's board of directors and of Manhattan's board of directors, referred to above, were signed in each instance by Elliott Sperber, as secretary, and those minutes in each instance recite that Jacob Sperber and Elliott Sperber were present. The directors of both corporations were Jacob Sperber, Tillie Sperber, and Elliott Sperber. Manhattan acquired title to the property in April 1933. In its income tax return for 1933, the petitioner reported a net loss of $19,885.42. In arriving at that amount no deduction was claimed with respect to the $100,000 loan to United. In 1935, pursuant to an order of the United States District Court in the bankruptcy proceedings, petitioner's claim was withdrawn and disallowed upon the allowance to it of the sum *102 of $40,000 on its claim against the bankrupts, and it accepted this allowance and the mortgaged premises in settlement of its claims against both United Stores Realty Corporation and United Cigar Stores Company of America. The $40,000 was paid to Stroock & Stroock, attorneys for petitioner, who retained $10,000 as compensation for services rendered and remitted $30,000 to petitioner. This amount of $30,000 was credited in July, 1935, against the $100,000 obligation entered in an account captioned "Mortgage Receivables" on petitioner's books. That account was established in 1928, and the only entries therein were the original entry recording the $100,000 mortgage from United and an entry in 1935 recording a payment of $30,000. There was no account on the books of petitioner as between petitioner and Manhattan. In its income tax return for the year 1935, the petitioner reported net income of $16,581.99, of which $13,995.66 was non-taxable interest from Liberty Bonds, and paid income tax in the amount of $355.62. No deduction was claimed in this return with respect to the $100,000 loan. The services rendered by Stroock & Stroock to petitioner, for which the aforementioned $10,000 *103 payment was made, were all in connection with the default on the $100,000 loan by the United Stores Realty Corporation, the prosecution of the claim of petitioner against United Cigar Stores Company of America on the collateral guarantee, advice with regard to petitioner's owning property in Pennsylvania, preparation of papers for the assignment of the bid for the property by petitioner to Manhattan, and related matters. The agreement between petitioner and this law firm provided for the retention by the law firm of $10,000 for such services. Ne deduction was claimed by petitioner in its 1935 Federal corporate income tax return with regard to the $10,000 payment. Legal services in connection with the foreclosure of the mortgage on the premises at 6001 Market Street were rendered in Philadelphia, Pennsylvania, by the law firm of Wolf, Block Schorr & Solis-Cohen. On May 10, 1933, Manhattan paid this firm $893.18 for such services, and paid Stroock & Stroock $20.25 in repayment of office disbursements. From the time of the acquisition of the property by Manhattan in 1933, it was managed by a Philadelphia real estate firm. The rents were collected and deposited in Manhattan's bank *104 account maintained at the Tradesmen's National Bank and Trust Company, Philadelphia, Pa. Statements were regularly rendered by the real estate firm to Manhattan accounting for such collections and deposits. That real estate firm was engaged to render such services by Mr. Jacob Sperber, and it looked to Mr. Sperber for instructions. Manhattan had no books upon which it set up "a demand credit" to the order of petitioner "in the sum of $100,000 bearing interest at 6% per annum", as required by petitioner's letter of April 6, 1933, quoted above. No note or other evidence of indebtedness was ever executed by Manhattan with respect to its alleged indebtedness to petitioner. Manhattan kept a check book; it had no other books of account, although there were in existence its accountant's work sheets, as well as the balance sheets and income statements which constituted a part of each of its Federal income tax returns. After the $30,000 was received by petitioner in 1935, as set forth above, the following letter addressed by petitioner to Manhattan, dated July 24, 1935, was inserted in the minute book of Manhattan: "Gentlemen: "RE: PROPERTY 60TH and MARKET STREETS, PHILADELPHIA, PA.
*105 "We have received $30,000 which is the amount of the net proceeds to us of first and final dividend on claim filed against the United Stores Realty Corporation. This amount we have applied, pursuant to our agreement with you, on account of the indebtedness due us from you in connection with your purchase from us of the above premises. "Yours very truly, JET CORPORATION By (signed) Elliott Sperber, Treas." In the balance sheet which forms part of Manhattan's 1933 Federal income tax return there is inserted after item 16 in the balance sheet as of December 31, 1933, "Mortgages (Including bonds and notes so secured)" the amount of $100,000, indicating a liability of this amount. A similar entry appears after item 16 in the balance sheets as of January 1 and December 31, 1934, on Manhattan's 1934 Federal income tax return. On its 1935 Federal income tax return, the amount of the item 16 liability as of the end of the year is reduced to $70,000. On April 29, 1943, Manhattan paid petitioner $10,000. On check stub number 323 of Manhattan this payment was recorded as "Account mortgage premises 6001 Market Street, Philadephia". Manhattan at this time also executed a mortgage on the property *106 in favor of petitioner. The mortgage recited that the mortgagor (Manhattan) was indebted to petitioner "by a certain Obligation or Writing under its name and corporate seal duly executed, bearing even date herewith". No such "Obligation or Writing" was ever executed. In the balance sheets forming part of Manhattan's income tax return for 1943, "Bonds, notes, and mortgages payable" were reported as $70,000 at the beginning of the year and $60,000 as of the end of the year. In its income tax returns for the years 1933 to 1943, inclusive, Manhattan reported items of income represented by the rents from the property, and claimed deductions for depreciation and other items, including payments to petitioner designated as "interest". The deductions thus claimed for "interest" were in the following amounts: 1933
$ 2,000.00
1934
2,500.00
1935
2,800.00
1936
3,500.00
1937
3,500.00
1938
2,800.00
1939
2,800.00
1940
2,800.00
1941
2,800.00
1942
2,100.00
1943
1,266.67
Total
$28,866.67 Although petitioner's letter of April 6, 1933, prescribed "interest" at the rate of 6 per cent, the rate at which these payments were computed varied from year to year and were *107 always under 6 per cent. The actual rate was based upon Manhattan's net income; and since a deduction for depreciation was taken each year in computing such net income, Manhattan in fact had funds on hand each year derived from its gross income, out of which it could have paid more "interest" and thus more nearly approached the 6 per cent rate specified in the foregoing letter of April 6, 1933. On the books of petitioner, the amounts received from Manhattan as interest were entered in an account called "interest received on bank balances, notes, mortgages, etc." In 1933, the Market Street property was placed in the hands of a real estate dealer for sale, with instructions to produce the nearest offer to $100,000 that was received. Efforts to sell were unsuccessful prior to 1944. In that year an offer of $47,000 was received for the property, payable $16,000 in cash and $31,000 by mortgage. After discussion, it was decided that a better offer would not be forthcoming. At a special meeting of the board of directors of petitioner held on May 10, 1944, the chairman advised the members of the $47,000 offer; that after investigation he was satisfied that this was a fair price for the *108 property; that because of the $60,000 mortgage held by the petitioner, Manhattan could not consummate the sale without petitioner's approval and the satisfaction of the mortgage; and that Manhattan had proposed that if petitioner would satisfy its mortgage, Manhattan would assign to it, "in full payment and satisfaction of the * * * existing mortgage and bond and warrant, the new bond and warrant and mortgage to secure the sum of $31,000", and would in addition pay to petitioner "any and all moneys" in its treasury after consummation of the sale. The directors thereupon passed the following resolution: "RESOLVED that this corporation satisfy its said mortgage of $60,000 and receive in full discharge of the said indebtedness of Manhattan Real Estate Holding Co. to it of $60,000, the above-mentioned bond and warrant and mortgage and all of the cash in the account of Manhattan Real Estate Holding Co. which is left after the consummation of the aforesaid sale and the payment of expenses thereof; and it was "FURTHER RESOLVED that any officer of this corporation be and he hereby is authorized and directed to execute any and all papers necessary to consummate said transaction." On the *109 same day, the directors of Manhattan passed a resolution that it agreed with petitioner to transfer to petitioner the purchase money mortgage of $31,000 to be received upon the sale of the Market Street property; to pay petitioner all cash on hand after the sale of the property and payment of the expenses and taxes; "and that in consideration thereof Jet Corporation satisfy and discharge the indebtedness of this corporation to Jet Corporation in the sum of $60,000 and the mortgage, which is now a lien on the premises 6001 Market Street, to secure said indebtedness". Manhattan concluded the sale of the Market Street property in May 1944, and thereafter made the following payments to petitioner: June 1, 1944
$15,000.00
August 10, 1944
232.50
Nov. 9, 1944
232.50
Dec. 26, 1944
698.10
$16,163.10 In addition the petitioner received the purchase money mortgage for $31,000. On October 25, 1944, Manhattan's stockholders voted to terminate its existence. By the close of 1944, it was without assets. The purchaser of the property had no connection, directly or indirectly, with Manhattan or petitioner or the stockholders thereof. In its United States corporate income *110 tax return for 1944, petitioner claimed a bad debt deduction of $13,101.90, explained thereon as: "Loss on satisfaction of first mortgage of $60,000 held on premises 6001 Market Street, Philadelphia, Pennsylvania. Mortgage was satisfied for total consideration of $46,898.10, representing a net loss as a bad debt of $13,101.90. No deduction was at any other time claimed by petitioner with regard to either the original $100,000 loan to United or to the alleged obligation due it from Manhattan. At the hearing, the parties orally entered into a stipulation of facts which is incorporated herein by reference. Petitioner and Manhattan were commonly controlled by stockholders with common interests. The affairs of both corporations were dominated primarily by Jacob Sperber, and to a lesser extent, by Elliott Sperber. The transactions between Manhattan and petitioner did not establish a bona fide debtor-creditor relationship. Opinion RAUM, Judge: Petitioner in 1928 made a loan of $100,000 to United Stores Realty Corporation, secured by a mortgage on certain real estate and guaranteed by the borrower's parent corporation. In 1932 both the borrower and its parent filed petitions *111 in bankruptcy, and in 1933, at a foreclosure sale of the mortgaged property, the petitioner herein made a nominal bid of $50 and became the successful bidder. Thereafter, in 1935, petitioner was awarded $40,000 which, in effect, constituted its first and final dividend to be paid from the assets of both bankrupts. Of that amount, $10,000 was retained by petitioner's attorneys for services rendered, and the remaining $30,000 was paid over to petitioner. Thus, the transaction was completely closed in 1935, and no deduction with respect to that loan could be taken after 1935. Cf. , affirmed, (C.A. 5). It was not open to petitioner to keep it alive for later years. Yet, throughout petitioner's case, there is undercurrent the suggestion that Manhattan "stepped into the shoes" of the borrower, and that the original transaction was not finally closed until 1944. Its returns were filed apparently on that theory. It claimed no deduction nor did it report taxable gain [1] with respect to the original loan either for 1933 or 1935. But the 1928 loan was fully erased in 1935. Petitioner had no right to treat that *112 $100,000 liability as alive thereafter for tax purposes, either on its books or otherwise, and its position is not aided by viewing Manhattan as though it had replaced the original debtor. Petitioner, however, contends that in any event Manhattan became indebted to it in 1933 when Manhattan acquired the property, and that it is entitled to a bad debt deduction in 1944 with respect to that new indebtedness. Respondent, on the other hand, argues that there was no real debt between Manhattan and the petitioner, with the result that the claimed deduction is not allowable. Upon examining all the facts, we are satisfied that there was no genuine, bona fide indebtedness running from Manhattan to petitioner; that Manhattan was merely holding the *113 property under an arrangement for the benefit of petitioner, paying over to petitioner substantially all of the net income realized from the property, until such time as it would be possible to sell the property and then to pay over the net proceeds to petitioner. At the time that petitioner became the successful bidder in the 1933 foreclosure sale, those who controlled its affairs became aware of certain disadvantages in taking title in petitioner's name. The property involved was located in Pennsylvania, and petitioner was not qualified to do business in that state; moreover, petitioner owned substantial assets in the form of securities, and it was thought unwise to subject such assets to local taxes and other possible claims that might arise in connection with the operation of the Pennsylvania real estate. In the circumstances, it was decided to create a new corporation, Manhattan, to take title to the property. The new corporation had no assets of any consequence other than the property. The manner in which Manhattan acquired the property was unusual. Petitioner purported to sell to Manhattan, not the property itself, but its $50 bid; and the stated price was $100,000, against *114 which petitioner agreed to credit such amounts as it might receive in the future from the two bankrupts. This was an extraordinary transaction, and certainly not one that would have been entered into by persons acting at arm's length. Why would a seller consent to have the purchase price reduced from time to time depending upon what he recovered from the estate of a prior bankrupt mortgagor that had no connection whatever with the new purchaser? This suggests, rather, that for bookkeeping purposes, petitioner was attempting to place Manhattan "in the shoes" of United, so that the fiction would be maintained that there was still a $100,000 loan outstanding. Moreover, the letter of April 6, 1933, which offered to "sell" the $50 bid to Manhattan required that the purchase price "be paid by you by putting and keeping on your books a demand credit to our order in the sum of $100,000 bearing interest at 6% per annum". Notwithstanding the language just quoted, no such credit was ever set up on Manhattan's books: Manhattan had no books other than a checkbook and possibly some work papers of an accountant who served both corporations. Nor did petitioner set up on its books any account receivable *115 from Manhattan. And although it is true that a mortgage was belatedly executed in 1943 by Manhattan, it contained a wholly false recital that "the said Mortgagor, in and by a certain Obligation or Writing obligatory under its name and corporate seal duly executed, bearing even date herewith" was indebted to petitioner. No such "Obligation or Writing" was ever in existence, nor was any note or other evidence of indebtedness ever executed by Manhattan at any other time in connection with the alleged indebtedness. Again, while interest was to have been paid at 6 per cent, we are satisfied that there never was any intention to pay interest as so stated. To be sure, an amount was paid over each year by Manhattan to petitioner that was designated as "interest"; but the so-called rate varied from year to year and was determined in such manner as to pay over to petitioner substantially all of Manhattan's taxable net income. The stipulated 6 per cent figure was completely ignored. But more than this: petitioner was on the accrual basis of accounting, and one would suppose that if there were a genuine obligation to pay interest at 6 per cent petitioner would have accrued interest at that rate *116 whether paid or not. Yet petitioner offered no evidence that it reported as income each year the amount properly accruable rather than the lesser amount actually received. Indeed, the evidence affirmatively suggests that it recorded on its books only the amounts actually received rather than the amounts properly accruable, and presumably its returns were filed in accordance with its books. Perhaps no one of the foregoing considerations is conclusive. But when taken together against the background of the factual picture presented by this case, we think that there was not any real indebtedness as a matter of fact between Manhattan and petitioner, and that there is no basis upon which to predicate a deduction for a worthless debt. Whether petitioner sustained a loss, capital or otherwise, in 1944 in connection with the property is an issue that was not presented to the Court for decision. [2]
*117 Decision will be entered for the respondent. Footnotes
1. At the hearing petitioner offered testimony to the effect that the mortgaged property was worth $85,000 at the time of foreclosure. If such was its value, it was incumbent upon petitioner to report as income the excess of that value plus the cash distribution over the amount of the loan. Similarly, if the value of the property plus the cash distribution was less than the amount of the loan, there would be a basis for a claim of deduction.↩
2. While it is true that the petition (paragraph 4) alleged error generally in respondent's refusal to allow a deduction in the amount of $13,101.90, as well as his refusal to allow a bad debt deduction in that amount, the case was tried on the theory that only the bad debt issue was involved, and petitioner's brief addresses itself exclusively to the bad debt issue. In the circumstances, any issue other than the bad debt issue must be deemed to have been abandoned.↩